UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
ALAYA YOUNGBLOOD, as proposed administrator of the Estate of TARZS YOUNGBLOOD, Deceased,

Plaintiff,

-against-

CITY OF NEW YORK, LOUIS MOLINA, CAPTAIN BLAKE, CORRECTION OFFICER HARRIS, CORRECTION OFFICER DeJESUS, LIONEL E. DESROCHES, M.D, ADAM LITROFF, DO, SERAPHINE MOHLIE, AGLAE NAPOLEON, and JOHN and JANE DOE ##1-15 (said names being fictitious, the persons intended being those who were involved or participated in the conduct complained of and/or aided and abetted the unlawful conduct of the named Defendants),

Defendants.
---------------------------------------------------------------X

Docket No.:

**COMPLAINT**

**JURY TRIAL REQUESTED**

Plaintiff ALAYA YOUNGBLOOD ("Plaintiff" or "Alaya Youngblood"), by her attorneys, MADUEGBUNA COOPER LLP, for her complaint alleges:

## I. THE NATURE OF THIS ACTION

1. On February 27, 2022, Tarzs Youngblood, a/k/a "Tarz Youngblood," a 38-year-old father of three young children, died on Rikers Island in the custody of the New York City Department of Correction.

2. Mr. Youngblood was the first Rikers detainee to die in 2022.

3. 19 more would follow, making 2022 Rikers' deadliest in the last 25 years.[1]

4. Rikers is a hellhole. Detainees face inhuman and dangerous living conditions with inadequate supervision, chronic staff absenteeism, overcrowding and lack of medical care.

5. In June 2022, a federal monitor reported that Rikers is "dangerous and unsafe, and the conditions are volatile."

6. Mr. Youngblood was found unresponsive in a cell by fellow detainees after Correction Officers failed to conduct rounds in violation of DOC policy.

7. Worse, the Correction Officers knowingly failed to help Mr. Youngblood or perform emergency first-aid in violation of DOC policy.

8. In a stunning scene captured on video, the Correction Officers stood around and watched while detainees carried Mr. Youngblood, who was unconscious, from the cell and down the stairs to a dayroom table.

9. Mr. Youngblood then died after receiving delayed and negligent medical care from Defendants.

10. At every single stage of this tragic sequence of events, Defendants were deliberately indifferent to Mr. Youngblood's medical needs, violated his civil rights and were negligent.

11. Overall, Mr. Youngblood died as a direct result of Defendants' failure to prevent the flow of dangerous drugs into Rikers; failure to conduct rounds and supervise detainees; failure to properly staff the housing unit and failure to provide timely and adequate medical care, including the rapid administration of Narcan to reverse the effects of fentanyl exposure.

12. As a result, Plaintiff brings this action pursuant to 42 U.S.C. § 1983 for violating the Fourth and Fourteenth Amendments to the U.S. Constitution for (i) deliberate indifference to medical care, (ii) government interference with familial association, and (iii) acting as part of a municipal practice or custom under *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 701 (1978).

---

[1] Jan Ransom & Jonah Bromwich, *Tracking the Deaths in New York City's Jail System*, NEW YORK TIMES, May 17, 2023, *available at* https://www.nytimes.com/article/rikers-deaths-jail.html; Aundrea Cline-Thomas, *Rikers Island*

13. Plaintiff also brings this action against Defendants for declaratory judgment and to recover money damages under the laws of New York for (i) wrongful death, (ii) conscious pain and suffering, (iii) negligence and gross negligence, (iv) recklessness, (v) vicarious liability, (vi) negligent hiring, training and supervision, (vii) negligent infliction of emotional distress, (viii) negligent failure to provide medical care – ministerial neglect and (ix) medical malpractice.

## II. JURISDICTION AND VENUE

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

15. This Court has supplemental jurisdiction over the state causes of action pleaded.

16. Venue is proper in this district under 28 U.S.C. § 1391(b) because the underlying events took place in this district.

## III. NOTICE OF CLAIM

17. On May 10, 2022, Jalena Miller, domestic partner of Mr. Youngblood and mother of their three children, served on Defendant CITY a Notice of Plaintiff's Claim and Notice of Intention to sue for the stated causes of action pled.

18. On June 29, 2022, attorneys from Harris Beach PLLC, on behalf of the CITY, emailed informally requesting to schedule a hearing of "claimant" pursuant to § 50(h) of the General Municipal Law.

19. On June 8 and 11, 2022, the undersigned agreed to make Jalena Miller available for a § 50-h hearing while explaining that she would not be named administrator but was the best person for the § 50-h hearing as the mother of three beneficiaries.

20. On July 13, 2022, the CITY declined to proceed with the 50-h hearing of Jalena Miller because she had not been appointed administrator and it was the CITY Comptroller's

---

*reports death of detainee Tarz Youngblood, 1st of 2022*, CBS News New York, February 28, 2022, *available at*

preference to hold the § 50-h for the administrator.

21. The CITY never served formal notice to conduct a § 50-h hearing.[2]

22. The CITY thereby waived the § 50-h hearing.

23. More than 30 days have elapsed since the Notice of Claim was served upon the CITY, and the CITY has neglected or refused to make any adjustment or payment.

24. This action is commenced within one (1) year and ninety (90) days after the cause of action arose on February 27, 2022.

## IV. PROCEDURAL HISTORY

25. On June 15, 2022, Carol Youngblood, stepmother of Mr. Youngblood, petitioned the Surrogate's Court, County of Queens, for Limited Letters of Administration through the undersigned's office.

26. On October 3, 2022, the Surrogate's Court declined to issue Limited Letters and required a new proposed administrator.

27. On October 13, 2022, the undersigned filed an Amended Petition for Limited Letters of Administration with Alaya Youngblood as the proposed Administrator.

28. To date, the Surrogate's Court has not issued Limited Letters or formally rejected the petition of Alaya Youngblood.

## V. PARTIES

### *A. Plaintiffs*

29. Plaintiff Ayala Youngblood is the half-sister and Proposed Administratrix of the

---

[2] *S. Tier Plastics, Inc. v. County of Broome*, 862 N.Y.S.2d 175, 176 (3d Dept. 2008) (citing General Municipal Law § 50-h(5)) ("Notably, the examination must be conducted within 90 days of the service of the demand, or a claimant may commence the action without it."); *Belton v. Liberty Lines Transit, Inc.*, 769 N.Y.S.2d 885 (Dept. 2004); *see also Hymowitz v. City of New York*, 996 N.Y.S.2d 337, 338 (2d Dept. 2014) (failure to appear for noticed 50-h hearing excused where decedent's counsel offered to produce the proposed administrator and City declined and did not demand the appearance of another person).

goods, chattels and credits of Mr. Youngblood, deceased.

30. At all relevant times, Plaintiff was a citizen of the United States and a resident of Kings County, State of New York.

31. On February 27, 2022, decedent Mr. Youngblood was a resident of Queens, County, State of New York and was in the custody of DOC, living in Bronx County on Rikers Island in Housing Area 9A of the George R. Vierno Center ("GRVC").

32. Mr. Youngblood died intestate on February 27, 2022, leaving three infant children.

33. To date, a petition for Limited Letters of Administration of the Goods, Chattels, and Credits of the decedent is pending before the Surrogate's Court, County of Queens to Plaintiff, the Proposed Administrator.

*B. Correction Officer Defendants*

34. Defendant CITY is a municipal corporation existing under and by virtue of the laws of the State of New York.

35. At all times relevant, Defendant LOUIS MOLINA was Commissioner of DOC, responsible for overseeing Rikers and responsible for the policy, practice, supervision, implementation and conduct of all DOC matters and for the training, supervision and conduct of all DOC personnel, including the DOC Defendants referenced.

36. MOLINA was also responsible for the care, custody and control of all detainees in DOC's facilities, including Rikers.

37. MOLINA is sued in his personal and official capacity.

38. At all times relevant, Defendant CAPTAIN BLAKE was a Correction Officer employed as a Captain by the CITY with supervisory responsibility over the Correction Officers assigned to Rikers.

39. BLAKE is sued in his personal capacity.

40. At all times relevant, Defendant CO HARRIS was a Correction Officer employed by the CITY assigned to Rikers.

41. HARRIS is sued in his personal capacity.

42. At all relevant times, Defendant CO DeJESUS was the "B" post officer assigned to conduct rounds in Mr. Youngblood's Housing Area 9A every 30 minutes in GRVC.[3]

43. At all times relevant, Defendant CO JOHN DOE #1 was a Correction Officer employed by the CITY assigned to Rikers as the "A" post officer in Housing Area 9A in GRVC.

44. CO JOHN DOE #1 is sued in his personal capacity.

45. At all times relevant, Defendant CO JOHN DOES ##2-5 are the Video Monitoring Unit officers at Rikers responsible for notifying on-duty staff of any security breaches like a covered cell window.

46. CO JOHN DOE ##2-5 are sued in their personal capacities.

47. At all times relevant, all Defendant "JOHN and JANE DOES" were officers, employees and agents of the CITY at Rikers, whose names and addresses are currently unknown, who directly participated in the unlawful activity that is the subject of this Complaint.

48. All the Defendant COs and DOC staff described above are sued individually and in their official capacities and were acting in the course and scope of their duties and functions as agents, servants, employees and officers of the CITY and otherwise performed and engaged in

[3] A housing unit is supposed to be staffed with an "A" officer in the control room behind plexiglass and a "B" officers on the floor conducting rounds in direct contact with detainees.

conduct incidental to the performance of their lawful functions in the course of their duties under color of state law.

49. At all relevant times, the Defendant COs were each individually hired, screened, tested, interviewed, trained, retrained, investigated, monitored and supervised by Defendant CITY and DOC.

*C. The Medical Defendants*

50. At all times relevant, Defendant LIONEL E. DESROCHES, M.D. was a physician licensed to practice medicine in New York, employed by the CITY and DOC and responsible for the medical care of people incarcerated at Rikers.

51. DR. DESROCHES is sued in his personal capacity.

52. At all times relevant, Defendant ADAM LITROFF, DO was a physician licensed to practice medicine in New York and employed by the CITY and DOC at Rikers.

53. DR. LITROFF is sued in his personal capacity.

54. At all times relevant, Defendant SERAPHINE MOHLIE was a physician assistant licensed to practice in New York and employed by the CITY and DOC at Rikers.

55. MOHLIE is sued in her personal capacity.

56. At all times relevant, Defendant AGLAE NAPOLEON was a registered nurse licensed to practice as a nurse in New York and employed by the CITY and DOC at Rikers.

57. NAPOLEON is sued in her personal capacity.

58. Each and every act of the Defendants alleged herein was done by the Defendants, their agents, servants and employees, and each of them, both as individuals, and under the color and pretense of the statutes, ordinances, regulations, customs and usages of the State of New York, the CITY and under their authority as Correction Officers.

## VI. FACTS COMMON TO ALL CAUSES OF ACTION

*Incarceration at Rikers*:

59. In September 2021, Mr. Youngblood became incarcerated at Rikers as a detainee in the custody and control of DOC.

60. Mr. Youngblood was being held in pre-trial general population after failing to make cash bail for a series of related low-level charges.

61. During custody and at the time of his death, Mr. Youngblood had no history of drug addiction, mental health issues or recent illness other than Covid-19 that he contracted at Rikers. He was not listed as an "at-risk" detainee.

*Treatment that Foreshadowed a Preventable Death*:

62. On December 31, 2021, Eric Adams became Mayor of the CITY.

63. On January 1, 2022, MOLINA was named Commissioner of DOC.

64. On about February 22, 2022, Mr. Youngblood was assaulted by a detainee.

65. Upon information and belief, DOC failed to take proper steps to investigate the February 22, 2022 attack and ensure Mr. Youngblood's safety.

66. In the weeks before his death, Mr. Youngblood contracted COVID-19 and had been left in a freezing transportation van for a long time without adequate clothing.

67. He was forced to urinate on himself due to the staff's failure to remove him from the van.

68. Also, in the weeks prior to his death, a CO, without justification or provocation, pepper sprayed Mr. Youngblood, causing him personal injuries, pain and suffering.

69. Mr. Youngblood's public defenders experienced incidents where other detainees escorted the attorney for a client visit and produced Mr. Youngblood, not a CO, revealing the troubling staffing issues and disorder at Rikers that would soon cause Mr. Youngblood's death.

*Detainees Find Mr. Youngblood Unresponsive in a Cell*:

70. On February 27, 2022, at approximately 10:35 a.m., several detainees found Mr. Youngblood unresponsive in a cell with an obscured and covered window in Housing Area 9A.

71. The medical examiner concluded that Mr. Youngblood died from exposure to fentanyl.

72. For hours before Mr. Youngblood's death, Defendants failed to conduct regular rounds to supervise detainees – as required by DOC policy to prevent reasonably foreseeable harm to detainees – in the housing unit where Mr. Youngblood became distressed.

73. Defendant DeJESUS, the "B" post officer, failed to conduct rounds every 30 minutes.

74. Initially, no DOC staff responded to assist or provide medical care to Mr. Youngblood, like an immediate dose of naloxone sold at pharmacies as Narcan for about $50 or offered free from the CITY and other organizations, that any layperson without medical training can administer.[4]

75. The CITY and DOC failed to provide Narcan nasal spray to COs and DOC staff in an organized manner, despite the risk of opioid and fentanyl overdose being reasonably foreseeable and a well-known danger to detainees at Rikers.

---

[4] Katherine Dillinger, *Narcan nasal spray maker aims for over-the-counter price of less than $50*, CNN, April 20, 2023, *available at* https://www.cnn.com/2023/04/20/health/narcan-price/index.html

76. Upon information and belief, Narcan was even available for detainees to administer on Rikers – but DOC had no standardized Narcan protocols or directives for COs or staff as of February 27, 2022.

77. Indeed, on July 17, 2022, Rikers detainees in a video are seen providing Narcan and chest compressions to a fellow detainee who was unresponsive.

78. Since DOC staff refused to help or were not present, against policy, several detainees lifted Mr. Youngblood, left the cell and carried his limp body down the stairs into the dayroom.

79. The detainees placed Mr. Youngblood on a dayroom table in the presence of CO DeJESUS, who just stood there and watched, in violation of DOC policies.

80. CO DeJESUS did not respond to Mr. Youngblood on the second floor, help carry him or provide cardiopulmonary resuscitation procedures ("CPR") or any other emergency medical assistance, despite being required to have such training and a mandate to immediately intervene in medical emergencies or conduct CPR under mandatory rules and regulations.

81. CO DeJESUS never checked on Mr. Youngblood or otherwise responded to his medical emergency.

82. CO DeJESUS also delayed in notifying medical staff that a detainee was unresponsive and having a medical emergency.

83. In addition, the CITY assigned an "A" post officer classified as "Medically Monitored Returned Category 3," which is a type of modified duty prohibiting COs from working directly with detainees.

84. As a result of this negligent assignment, the Defendant John Doe #1 "A" post officer was prevented from providing Mr. Youngblood emergency first-aid and failed to do so when DeJESUS failed and refused to act.

85. In further violation of DOC policy, Defendant JOHN and JANE DOES in the Video Monitoring Unit failed to notify on-duty staff of security breaches, including the obstructed and covered window in the cell where detainees found Mr. Youngblood unresponsive.

86. Defendants CAPTAIN BLAKE, HARRIS, DeJESUS, JOHN DOE #1 and all JOHN and JANE DOES failed to immediately and properly use an automated external defibrillator ("AED") on Mr. Youngblood while waiting for medical staff to arrive.

87. Defendant CAPTAIN BLAKE (and any JOHN DOE tour commander or supervisor) failed to properly supervise Housing Unit 9A and ensure that COs were conducting rounds and monitoring detainees, as required by DOC policy.

88. The Defendant Medical Staff arrived on the scene several minutes after detainees brought Mr. Youngblood to the main floor.

*<u>Defendants' Negligent Medical Treatment</u>*:

89. The responding Defendant Medical Staff provided medical care that was delayed, negligent and improperly performed.

90. The Medical Defendants deviated from the accepted standard of medical practice by (i) failing to immediately and properly use an automated external defibrillator ("AED") on Mr. Youngblood; (ii) failing to immediately and properly intubate and ventilate Mr. Youngblood; (iii) failing to immediately and properly insert an IV on Mr. Youngblood and (iv) otherwise failing to provide proper medical care to an unresponsive individual.

91. At Rikers, Mr. Youngblood suffered cardiac arrest and became asystolic, meaning no heartbeat.

92. Mr. Youngblood was transported to Elmhurst Hospital, where he was pronounced dead at 11:44 a.m.

93. While Mr. Youngblood died at Rikers, upon information and belief, Defendants avoided calling his time of death at Rikers to avoid liability and distort fatality statistics at Rikers.

*The Board of Correction's August 2022 Presentation*:

94. In August 2022, after several alarming deaths at Rikers, the CITY Board of Corrections[5] provided a presentation to Assistant District Attorneys in Manhattan about the conditions at Rikers.[6]

95. The presentation included images of detainees carrying Mr. Youngblood and another instance where detainees carried a fellow detainee to the health center.[7]

96. In response to BOC's presentation, Defendant MOLINA emailed that, "These disturbing images represent points in time — not continuous conditions on Rikers Island. Our infrastructure and staffing challenges, which are the result of years of mismanagement and neglect, are no secret."[8]

*Failures of the CITY and DOC Staff that Caused the Death of Mr. Youngblood*:

97. The failures of DOC and its staff that led to the tragic death of Youngblood are longstanding and well known to DOC and its staff, and were foreseeable and preventable.

---

[5] "The New York City Board of Correction, established by the City Charter, is an independent oversight board charged with regulating, monitoring, and inspecting the city's correctional facilities." *People ex rel. Stoughton v. Brann*, 122 N.Y.S.3d 866, 871 (N.Y. Sup. Ct. N.Y. Co. 2020).
[6] Matt Katz, *Never-before-seen images show Rikers inmates locked in caged showers, left in soiled pants, more poor conditions*, Gothamist.com, Sept. 28, 2022, https://gothamist.com/news/rikers-images-shower-cages-poor-conditions
[7] *Id.*
[8] *Id.*

98. Yet, the CITY, DOC and its staff failed to take necessary corrective measures to improve the current conditions for detainees such as Youngblood and prevent his death.

99. Since 2015, Rikers has been under federally appointed monitor as part of a consent decree due to lawsuits involving excessive force.

100. The CITY has been battling to prevent a federal receiver taking over control of Rikers from the CITY due to these intolerable conditions.[9]

101. In resisting federal control, the CITY has admitted the dangerous conditions and lapses at Rikers, while Adams' administration blames Mayor DeBlasio.

**A. Failure to Properly Staff Rikers & the Housing Unit**

102. Prior to and at the time of this incident, there was a shortage of staff in the housing unit, which impeded access to care for detainees that are vulnerable or in need of medical care, and the death of Youngblood was due to lack of adequate supervision and shortage of officers at the Jail.

103. Dangerous staffing issues at Rikers have been known for many years, and the CITY has been on notice of this dangerous condition.

104. As one Court recently summarized, "the staffing crisis affecting the conditions and detainee safety at Rikers has been well documented over the past decade."[10]

105. On September 10, 2021, Dr. Ross MacDonald, M.D., Chief Medical Officer for the CITY jail system, wrote CITY Council urging them to "ask for outside help to immediately stabilize a situation that has resulted in death and threatens the health and well-being of everyone who works and resides in city jails."[11]

---

[9] *Nunez v. N.Y.C. Dep't. of Corr.*, (S.D.N.Y.), Case No. 1:11-cv-5845 (Swain, J.).
[10] *Bell v. Adams*, 2022 WL 2287289, at *2 (N.Y. Sup. N.Y. Co. June 23, 2022).
[11] Letter from Dr. MacDonald to Keith Powers, Chair, Criminal Justice Comm., N.Y.C. Council, Sept. 20, 2021.

106. Dr. MacDonald continued that, "unfortunately, in 2021 we have witnessed a collapse in basic jail operations, such that today I do not believe the City is capable of safely managing the custody of" detainees and that the "breakdown has resulted in an increase in deaths which we refer to as jail-attributable, where jail conditions meaningfully contributed to the death."

107. Dr. MacDonald wrote that "death and injury are predictable consequences of repeated failures to perform certain essential functions due to unavailability of staff."

108. On September 14, 2021, Mayor DeBlasio declared a state of emergency in the CITY's jails and noted that "excessive staff absenteeism" is affecting health operations and creating "a serious risk to the necessary maintenance and delivery of sanitary conditions, access to basic services including showers, meals, visitation, religious services, commissary, and recreation and prompt processing at intake."[12]

109. On December 6, 2021, the federal monitor in *Nunez* informed the U.S. District Court that in regard to Rikers: "The facilities are dangerous, leadership and supervisors do not inspire or motivate Staff to cultivate their skills, Staff are not deployed to the housing units in a manner that enhances safety, and consequences for poor attendance and other types of misconduct are rarely imposed."

110. The federal monitor noted that COs were abandoning their posts without relief or permission and that on many days, as many as 80 posts went unmanned.

111. In a March 16, 2022 special report, the federal monitor continued to raise alarm about staffing and supervisory issues at Rikers, writing that DOC's "staffing issues are perplexing and driven by deeply ingrained patterns of mismanagement and dysfunction."

[12] Emergency Exec. Order No. 241, Declaration of Local State of Emergency.

112. On June 14, 2022, Mayor Adams acknowledged the "dysfunction" at Rikers, including lapses with contraband and staffing that caused Mr. Youngblood's death:

> There are no quick or easy solutions to reforming Rikers, but in just a few short months, we have seen reductions in slashings and stabbings, reductions in use of force and assaults on staff, increased searches for weapons and contraband, and fewer officers out on sick leave. It is a good start, but we must go much further.
>
> As the plan makes clear and as the court has agreed, we have a strategy to aggressively untangle the dysfunction that has plagued the jails and set them on a path of real, enduring reform.

113. The CITY's Corporation Counsel Sylvia Hinds-Radix also admitted that the CITY needed to "address the longstanding problems at Rikers" in order to "create a jail system that is both more humane and safer for all."

114. In September 2022, Defendant MOLINA admitted in an interview on Rikers, "We're making strides but we have a long way to go. When so much stuff has been allowed to enter our system over two years that none of those basic security protocols were being followed we are digging ourselves out from a situation that is very serious."

115. In relation to the contraband and opioid issue, the lack of staff at Rikers is caused by the CITY allowing employees to call out for sick leave and not enforcing policies, which in turn causes a lack of staff to prevent contraband from entering Rikers, to monitor detainees and conduct rounds and ensure that emergency medical care is dispatched quickly.

116. In May 2022, news reports found that hundreds of COs called out sick each day and hundreds more are on modified duty, leaving many posts unfilled at Rikers.

117. In May 2022, a Bronx judge ruled that the CITY was in civil contempt for failing to get detainees to medical appointments on Rikers in December 2021 and January 2022.

118. On November 7, 2022, Mayor Adams highlighted the worsening problems at Rikers in an op-ed:

> When I came into office as New York's 110th mayor, there was no question that the city's main jail, Rikers Island, was in serious need of reform and repair. Anyone who has set foot in Rikers in years past, from family members to Correction officers to those awaiting trial, has seen with their own eyes what decades of disinvestment looks like: peeling paint, crowded facilities, unsafe conditions for staff and detainees alike.
>
> Decades of mismanagement and neglect had created a culture of dysfunction that became normalized. Staffing shortages, assaults, deaths and drug overdoses were on the rise and became even worse during the COVID-19 pandemic.

**B. Failure to Properly Screen for & Prevent Drug Smuggling**

119. DOC has known about and failed to prevent the free flow of dangerous street drugs and other illicit substances into Rikers by, for example, failing to properly screen staff and visitors to the Jail and not conducting regular cell searches for contraband, as DOC policies require.

120. In addition, a 2015 report from the CITY's Department of Investigations suffered from an alarmingly flawed staff hiring and recruitment process that led to problems like staff drug smuggling into Rikers.

121. The DOI concluded that Rikers used a "a deeply flawed system in which more than a third of officers were hired despite numerous corruption and safety hazards, including multiple prior arrests and convictions, prior associations with gang members, or relationships with detainees."

122. In 2020, six COs were arrested for drug smuggling into Rikers.

123. Even in the months after Mr. Youngblood died, COs were being arrested for smuggling drugs into Rikers and pled guilty in August 2022 to federal charges.

124. In July 2022, reporting from the NEW YORK TIMES found that "a steady influx of illicit drugs has contributed to a spike in overdoses" and that even when visitors were canceled due to Covid, "investigators seized twice as many illegal drugs inside the jails as they had the prior year . . . suggesting that staff members were smuggling in the contraband."[13]

125. In October 2022, Defendant MOLINA testified to CITY Council that fentanyl was mainly brought to Rikers through the mail and that DOC was planning to scan non-privileged detainee mail to prevent paper soaked in fentanyl reaching detainees. However, MOLINA conceded that the N.Y.S. Department of Corrections and 140 other jails had already begun using this system, showing that the CITY was woefully unprepared in reasonably responding to known risks.

126. On March 14, 2023, the Board of Corrections blocked DOC from banning detainee mail and packages on Rikers to fight against fentanyl, citing a lack of evidence that mail was a major contributor factor to the flow of drugs causing overdoses.[14]

127. Furthermore, as of February 27, 2022, the CITY and DOC did not require COs and staff to be screened by body scanners like visitors and detainees to search for narcotics.

128. Despite knowing that staff were not being scanned and were contributing to the epidemic of opioid and fentanyl, the CITY and DOC avoided implementing body scanners due to union complaints, while showing a knowing disregard for detainee health and safety.[15]

---

[13] Jan Ransom, *In a Rikers Jail Cell, a Many Law Dead for Hours Before He Was Discovered*, N.Y. TIMES, July 12, 2022, *available at* https://www.nytimes.com/2022/07/12/nyregion/rikers-jail-man-dead.html

[14] Matt Katz, NYC jails oversight body rejects plan to ban mail and packages at Rikers, GOTHAMIST.COM, March 14, 2023, https://gothamist.com/news/nyc-jails-oversight-body-rejects-plan-to-ban-mail-and-packages-at-rikers

[15] Graham Rayman, *Body scanner installed at Rikers to check COs, staff for contraband*, N.Y. DAILY NEWS, Feb. 7, 2023, https://www.nydailynews.com/new-york/nyc-crime/ny-rikers-island-body-scanner-contraband-20230206-tjeslalhcjaxlhva4gn3arnfoy-story.html

129. Even as of February 2023, Defendant MOLINA and DOC have only brought one body scanner to Rikers to be used at a single facility to scan staff as part of a pilot program following pressure from CITY Council and advocacy groups.[16]

130. In contrast, detainees at Rikers have been subject to body scanning for contraband since 2019.

131. Upon information and belief, the CITY's lack of staffing caused a lack of cell searching for contraband like opioid and fentanyl laced items, whereby detainees could continue to be exposed to fentanyl due to the CITY's failure to inspect cells as required by DOC policy.

**C. Failure to Conduct Rounds & Monitor Detainees**

132. DOC policy requires Correction Officers to patrol and inspect each cell and each entire post area every 30 minutes. Correction Officers are responsible for the care, custody and control of the detainees and shall remain in their assigned areas and conduct visual observations at 30-minute intervals by, for example, walking through the area and making a visual observation of each detainee when locked in their cell, and observe signs of life.

133. As alleged above, in violation of this DOC policy, Mr. Youngblood had not been seen by a Corrections Officer for over 3 hours. Despite a requirement for COs to conduct rounds every 30 minutes, CO DeJESUS and other Correction Officers assigned to the housing unit failed to conduct inspection rounds, nor did they check the cell Youngblood was in for at least 3 hours before Youngblood was found unresponsive.

134. This is a pattern. The Board of Correction found that in seven (7) detainee deaths in 2022, COs did not conduct rounds in accordance with DOC policy.

135. Staff also failed to remove obstructions covering the cell window where the detainees found Mr. Youngblood, which impeded proper supervision of Youngblood.

---

[16] *Id.*

136. Also, per DOC policy, cell access is to be strictly controlled by officers. But officers assigned to the housing unit, such as CO DeJESUS, failed to do so.

137. As reported by NY1 on October 6, 2022, "Investigations from the Board of Correction, the jail's oversight body, have found correction officers in several of the other overdose deaths in 2021 and 2022 were not conducting proper rounds or were not responding to instances of open drug use on surveillance video."[17]

**D. Failure to Provide Immediate First Aid**

138. CO DeJESUS and other present CO JOHN and JANE DOES failed to provide emergency medical assistant to Mr. Youngblood and failed to and/or delayed providing any CPR or chest compressions despite being required by DOC policy to provide first-aid.

139. As alleged above, Defendants failed to immediately and properly use an AED on Mr. Youngblood.

140. This is also a pattern. The BOC found that in three (3) deaths in 2022, the COs present failed to give immediate first aid to unresponsive detainees.

**E. Failure to have CO Present that was Not on Modified Duty**

141. While housing units require an "A" and "B" post officer, one who conducts rounds and the other in the control room or "bubble," on February 27, 2022, the housing unit for Mr. Youngblood included an "A" post officer on modified duty prohibited from interacting with detainees directly.

142. As a result, Mr. Youngblood was unable to receive immediate first aid from a CO due to the CITY's negligent staffing.

**F. Failure to Enact Opioid or Fentanyl Overdose Directives**

143. As far back as 2014, the State of New York instituted a pilot program to provide Narcan and training to released state inmates due to the growing opioid crises.[18]

144. On December 21, 2018, the N.Y.C. Health + Hospitals and Correction Health Services announced that it had distributed 13,000 naloxone kits to visitors of Rikers and other CITY jails. The program was first launched at Rikers in 2014.[19]

145. As of May 4, 2021, the New York State Department of Corrections had a directive permitting the use of Narcan for Correction Officers responding to non-responsive individuals along with guidelines for the usage and storage of Narcan.[20]

146. In or around June 2022, DOC allegedly issued a directive that COs should be trained how to use Narcan.[21]

147. However, the Board of Corrections' Executive Director stated at a meeting in July 2022 that COs were unaware that they were expected to use Narcan or that they even had access to it in CITY jails.[22]

148. As alleged above, the BOC's August 2022 presentation included a video from July 17, 2022 on Rikers, where detainees were performing chest compressions on a fellow unresponsive detainee and screaming, "Get another Narcan!"[23]

---

[17] Courtney Gross, *NY1 Investigation: Fatal drug overdoses rise on Rikers Island*, NY1, October 6, 2022, *available at* https://www.ny1.com/nyc/all-boroughs/public-safety/2022/10/06/ny1-investigation--fatal-drug-overdoses-rise-on-rikers-island

[18] Press Release, *DOCCS, DOH, and HRC Announce New Opioid Program to Address Growing Opioid Crisis*, Feb. 6, 2015, https://www.health.ny.gov/press/releases/2015/2015-02-06_opioid_overdoes_prevention_program.htm

[19] NYC Health + Hospitals/Correctional Health Services Announces More Than 13,000 Naloxone Kits Have Been Distributed at NYC Jail Visitor Centers, Dec. 21, 2018 *available at* https://www.nychealthandhospitals.org/pressrelease/13000-opioid-overdose-kits-distributed-through-jail-visitor-centers/

[20] N.Y.S. Corrections & Comm. Sup., Directive No. 9434, dated May 4, 2021, https://doccs.ny.gov/system/files/documents/2022/10/9434-public.pdf

[21] Ransom, July 12, 2022, *supra.*

[22] *Id.*

[23] Katz, Sept. 28, 2022, *supra.*

149. The video proves the CITY's and DOC's failure to properly establish and administer Narcan to reverse the effects of opioid and fentanyl overdose even months after Mr. Youngblood's death, to the point where COs are not responding and detainees must provide Narcan.

150. Alarmingly, DOC and Rikers have been providing Narcan spray and training to visitors since 2015, but as of Mr. Youngblood's death, had no formal policy or directive regarding Narcan and overdoses.

151. On October 24, 2022, Defendant MOLINA testified before the CITY Council's Committee on Criminal Justice:

> In July of this year, we issued a Narcan policy to allow uniform staff to administer Narcan in the case of a suspected overdose. Narcan, otherwise known as Naloxone, is a live-saving medication that can reverse the effects of an overdose on opioids. We have recently conducted a facility-wide audit to ensure that Narcan is available in every housing area. And we have prepared a training video so that staff know how to identify symptoms of an opioid overdose and administer Narcan. In addition, we have posted information about the dangers of using illegal substances, including fentanyl, in all housing areas, corridors, and support areas.[24]

152. Following DOC's inadequate measures to a growing health crises, in March 2023, the CITY Council introduced a bill to require CITY COs to carry Narcan and receive training.

**<u>FIRST COUNT AGAINST THE INDIVIDUAL DEFENDANTS</u>**
**(Wrongful Death)**

153. Plaintiff repeats and realleges each allegation in each numbered paragraph above.

154. Defendants' alleged acts wrongfully caused the death of Mr. Youngblood.

155. Defendants owed Mr. Youngblood a duty to exercise reasonable care not to act in a manner that unreasonably threatened his health and safety.

156. Defendants breached their duty of care and were negligent by, *inter alia*, recklessly and negligently:

a. Failing to properly staff Rikers and Mr. Youngblood's housing unit;

b. Failing to properly train and supervise the COs;

c. Failing to properly screen for and prevent drug smuggling;

d. Failing to conduct rounds and monitor detainees;

e. Failing to provide immediate first aid;

f. Failing to have COs present not on modified duty;

g. Failing to enact opioid or fentanyl overdose directives; and

h. Failing to provide proper medical care.

157. Defendants' acts and failures to act caused Mr. Youngblood grievous bodily injury, including physical and mental pain and, ultimately, death.

158. Defendant CITY and DOC failed to adequately train and supervise the individual defendants on the proper manner in which to conduct and perform the duties alleged above.

159. Defendant CITY and DOC failed to develop or implement strategies or practical guidelines and instructions on how COs should act regarding opioid overdoses or fentanyl exposure, including providing Narcan and providing first-aid and monitoring cells.

160. Defendants are jointly and severally liable for their unlawful conduct, acts and omissions, and as a result decedent was caused to sustain injuries, suffer pain, be anguished and become and feel pre-death terror, and ultimately suffer death.

161. As a direct and proximate result of these Defendants' violations of the rights of Mr. Youngblood, which resulted in his death, Mr. Youngblood claims as damages pecuniary loss including but not limited to medical expenses; funeral expenses; lost earnings and financial

---

[24] https://www.nyc.gov/site/doc/media/october-25-testimony.page

support; loss of nurturing, care and parental guidance and household services.

162. As a direct and proximate cause, Plaintiff and Decedent's next of kin suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

**SECOND COUNT AGAINST THE INDIVIDUAL DEFENDANTS**
**(Conscious Pain & Suffering)**

163. Plaintiff repeats and realleges each allegation in each numbered paragraph above.

164. Upon information and belief, Mr. Youngblood was conscious for approximately thirty minutes after overdosing.

165. Defendants' alleged acts wrongfully caused Mr. Youngblood to suffered severe physical injuries, excruciating pain, mental anguish and awareness of impending death.

166. As a direct and proximate result of the Individual Defendants' unlawful conduct, Mr. Youngblood has suffered damages in an amount to be determined at trial but estimated to be no less than $100,000.00.

**THIRD COUNT AGAINST THE INDIVIDUAL DEFENDANTS**
**(Negligence and Gross Negligence)**

167. Plaintiff repeats and realleges each allegation in each numbered paragraph above.

168. Defendants' alleged acts wrongfully caused the death of Mr. Youngblood.

169. Defendants owed Mr. Youngblood a duty to exercise reasonable care not to act in a manner that unreasonably threatened his health and safety.

170. Defendants breached their duty of care and were negligent by, *inter alia*, recklessly and negligently failing to take the specific acts alleged in Count 1.

171. Defendants' acts and failure to act caused Mr. Youngblood grievous bodily injury including physical and mental pain and, ultimately, death.

172. As a direct and proximate cause, Plaintiff and Decedent's next of kin suffered loss

and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

**FOURTH COUNT AGAINST THE INDIVIDUAL DEFENDANTS**
**(Recklessness)**

173. Plaintiff repeats and realleges each allegation in each numbered paragraph above.

174. To the extent required, this claim is pled in the alternative to Plaintiff's claims in Counts 1-2 pursuant to CPLR § 3014.

175. The above conduct, acts and omissions of the individual defendants in monitoring and responding to Mr. Youngblood's health represent substantial departures from accepted penal judgment, professional judgment, practice or standards, and constituted negligence, gross negligence and recklessness.

176. The individual defendants were aware of the above DOC policies to screen for contraband, monitor prisoners, staff housing units, provide first-aid and administer medical care, and knowingly and intentionally violated the policies.

177. The occurrence and the injuries resulting to Decedent were caused solely and wholly as a result of the recklessness of the Defendants without any negligence on the part of Decedent contributing.

178. The conduct, acts and omissions of the individual defendants were the direct and proximate cause of the Decedent's injuries, pain, suffering, and death.

179. As a result, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

**FIFTH COUNT AGAINST DEFENDANT CITY**
**(Vicarious Liability)**

180. Plaintiff repeats and realleges each allegation in each numbered paragraph above.

181. At all relevant times, all individual defendants and DOES were employees of the CITY and were acting within the scope of their employment.

182. The CITY is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of all individual defendants and DOES alleged.

183. As a direct and proximate cause of the foregoing, Plaintiff suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

**SIXTH COUNT AGAINST DEFENDANT CITY**
**(Negligent Hiring, Training, & Supervision)**

184. Plaintiff repeats and realleges each allegation in each numbered paragraph above.

185. To the extent required, this claim is pled in the alternative to Plaintiff's claims in Counts 1-4 pursuant to CPLR § 3014.

186. Upon information and belief, the CITY failed to use reasonable care in the hiring, retaining, training, monitoring, retraining, promoting and supervision of the individual defendants and its other employees involved in staffing, monitoring and responding to Mr. Youngblood's medical distress.

187. As a direct and proximate cause of the foregoing, Plaintiff suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

**SEVENTH COUNT AGAINST THE INDIVIDUAL DEFENDANTS**
**(Negligent Infliction of Emotional Distress)**

188. Plaintiff repeats and realleges each allegation in each numbered paragraph above.

189. Defendants owed Mr. Youngblood a duty of care.

190. By reason of the foregoing, Defendants are liable to Plaintiff, in their individual capacities, for the negligent infliction of emotional distress.

191. As a result, Plaintiff suffered emotional distress.

192. As a direct and proximate cause of the foregoing, Plaintiff suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

**EIGHTH COUNT AGAINST THE INDIVIDUAL DEFENDANTS**
**(Negligent Failure to Provide Medical Treatment – Ministerial Neglect)**

193. Plaintiff repeats and realleges each allegation in each numbered paragraph above.

194. Defendants owed a duty of care to Mr. Youngblood to provide him with access to medical treatment while he was in the custody and care of the CITY and DOC, because under the same or similar circumstances, a reasonable, prudent and careful person should have anticipated that injury to Mr. Youngblood or to those in a like situation would probably result from the failure to provide access to immediate medical treatment.

195. Defendant DeJESUS failed to provide immediate first-aid, ignored pleas for help and stood watching Mr. Youngblood being carried by his fellow detainees.

196. Defendant JOHN and JANE DOES, as other present COs, failed to provide immediate first-aid, respond to pleas for help and stood watching Mr. Youngblood being carried.

197. Defendants knew, or should have known, that this failure to provide first-aid to Mr. Youngblood or immediately contact a doctor could and did exacerbate and worsen his condition, causing him severe injury, pain and, ultimately, death.

198. As a direct and proximate cause of the foregoing, Plaintiff suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

**NINTH COUNT AGAINST THE MEDICAL DEFENDANTS**
**(Medical Malpractice)**

199. Plaintiff repeats and realleges each allegation in each numbered paragraph above.

200. At all relevant times, the Medical Defendants undertook to provide medical care to detainees in its custody at Rikers, including Mr. Youngblood, and they were legally obligated and had a special duty to do so effectively.

201. The Medical Defendants were employed, retained and/or contracted with the CITY and DOC to provide medical care to all detainees in the care and custody of the CITY at Rikers, including Mr. Youngblood.

202. The Medical Defendants agreed and purported to provide medical care and services to detainees at Rikers, including Mr. Youngblood, throughout the entirety of Mr. Youngblood' incarceration at Rikers until his death on February 27, 2022.

203. The Medical Defendants held themselves out as possessing the proper degree of learning and skill necessary to render medical care, treatment, and as undertaking services in accordance with good and accepted medical practice, and that they undertook to use reasonable care and diligence in the care and treatment of Rikers' detainees, including Mr. Youngblood.

204. The Medical Defendants were negligent and careless, acted contrary to sound medical practice, and committed acts of medical malpractice against Mr. Youngblood.

205. The Medical Defendants deviated from the accepted standard of medical practice by:

a. Failing to immediately and properly use an AED on Mr. Youngblood;

b. Failing to immediately and properly intubate and ventilate Mr. Youngblood;

c. Failing to immediately and properly insert an IV on Mr. Youngblood; and

d. Otherwise failing to provide proper medical care to an unresponsive individual.

206. In committing these acts, the Medical Defendants failed to act in good faith in carrying out the duties of their employment and abused their power, while still acting under the

pretense and color of state law.

207. As a result of the Medical Defendants' medical malpractice, negligence, carelessness, and unskillfulness, Mr. Youngblood sustained the damages alleged.

208. As a direct and proximate cause of the above, Plaintiff suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

**TENTH COUNT AGAINST THE INDIVIDUAL DEFENDANTS**
**(Deliberate Indifference to Medical Care & Safety)**

209. Plaintiff repeats and realleges each allegation in each numbered paragraph above.

210. The Defendants, while acting under color of law, violated Mr. Youngblood's constitutional rights under the Fourteenth Amendment due process clause pursuant to Section 1983 by acting recklessly in failing to provide timely and proper medical care.

211. Based on Defendants' deliberate indifference, Mr. Youngblood suffered a wrongful death while in custody and confined in jail as a pretrial detainee.

212. As a direct and proximate cause of the above, Plaintiff suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

**ELEVENTH COUNT AGAINST THE INDIVIDUAL DEFENDANTS**
**(Right to be Free From Wrongful Government Interference with Familial Relationships)**

213. Plaintiff repeats and realleges each allegation in each numbered paragraph above.

214. By the actions and omissions described above, the individually named defendants violated 42 U.S.C. § 1983, by depriving Plaintiff and Mr. Youngblood of the right to be free from wrongful government interference with familial relationships and plaintiff's right to companionship, society and support secured by the Fourteenth Amendment.

215. As a direct and proximate cause of the above, Plaintiff suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

**TWELFTH COUNT AGAINST THE CITY**
**(*Monell* Violations pursuant to Section 1983)**

216. Plaintiff repeats and realleges each allegation in each numbered paragraph above.

217. The above acts and/or omissions of the CITY in being deliberately indifferent to Mr. Youngblood's serious medical needs and safety and violating his civil rights were the direct and proximate result of customs, practices and policies of the CITY.

218. The CITY, as a matter of custom, practice and *de facto* policy through its policymakers, including Defendant MOLINA, maintained a policy, custom, or practice of failing to (i) properly staff the housing units; (ii) properly supervise detainees; (iii) properly prevent the flow of dangerous drugs and substances and (iv) properly render first-aid to detainees and respond to medical emergencies.

219. As a result, Mr. Youngblood's constitutional rights were violated, as described above, resulting in the tragic loss of his life.

220. The acts and omissions and deliberate indifference by CITY officials, including MOLINA, resulted in the deprivation of Plaintiff's and Mr. Youngblood's constitutional rights.

221. These customs, practices, or polices were the proximate cause of Mr. Youngblood's injuries and the individually named defendants acted in accordance with this custom, policy or practice acted with deliberate indifference to the needs of Mr. Youngblood, who was in Defendants' custody and care.

222. As a direct and proximate cause of the above, Plaintiff suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## PUNITIVE DAMAGES

223. Plaintiff claims punitive damages by reason of the wanton, unrepentant, reckless and egregious conduct of the individual defendants alleged.

**WHEREFORE,** Plaintiff prays that this Court grant him judgment containing the following relief against the defendants, jointly and severally:

a. Impanel a jury to hear Mr. Youngblood's claims;

b. Damages in an amount to be determined upon the trial of this matter to compensate Mr. Youngblood for his monetary loss and damages;

c. Damages to compensate Mr. Youngblood for pain and suffering for each cause of action;

d. Punitive damages against the individual defendants;

e. Interest;

f. Reasonable attorneys' fees and costs under 42 U.S.C. § 1983 and § 1988; and,

g. Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
May 26, 2023

Respectfully Submitted,

SAMUEL O. MADUEGBUNA, ESQ.
**MADUEGBUNA COOPER LLP**
Attorneys for Plaintiff,
ALAYA YOUNGBLOOD
30 Wall Street, 8th Floor
New York, NY 10005
(212) 232-0155

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

ALAYA YOUNGBLOOD, as proposed administrator of the Estate of TARZS YOUNGBLOOD, Deceased,

Plaintiff,

-against-

CITY OF NEW YORK, LOUIS MOLINA, CAPATIN BLAKE, CORRECTION OFFICER HARRIS, CORRECTION OFFICER DeJESUS, LIONEL E. DESROCHES, M.D, ADAM LITROFF, DO, SERAPHINE MOHLIE, AGLAE NAPOLEON, and JOHN and JANE DOE ##1-15 (said names being fictitious, the persons intended being those who were involved or participated in the conduct complained of and/or aided and abetted the unlawful conduct of the named Defendants),

Defendants.

---------------------------------------------------------------X

Docket No.:

**CERTIFICATE OF MERIT**

SAMUEL O. MADUEGBUNA, an attorney duly admitted to practice law before the courts of the State of New York, hereby affirms, pursuant to CPLR 3012-a, as follows:

1. I am a partner at the law firm Maduegbuna Cooper LLP.

2. I have obtained records relating to the death of Tarzs Youngblood.

3. I have reviewed the facts of this case and have consulted with at least one physician who is licensed to practice in this State, or any other State, and I reasonably believe that said physician is knowledgeable as to the relevant issues involved in this particular action, and I have concluded on the basis of such review and consultation that there is a reasonable basis for the commencement of this action.

Dated: May 26, 2023
New York, New York

SAMUEL O. MADUEGBUNA
*Attorney for Plaintiff*